IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| THUNDER BASIN COAL COMPANY, L.L.C.<br><br>Plaintiff,<br><br>v.<br><br>ZURICH AMERICAN INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; THE TRAVELERS INDEMNITY COMPANY OF AMERICA; and THE TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA<br><br>Defendants. | No.  4:12-cv-00231-CDP |

## TRAVELERS' REPLY IN SUPPORT OF ITS MOTION FOR RECONSIDERATION

As Thunder Basin concedes, Federal Rule of Civil Procedure 54(b) provides this Court with considerable discretion to amend its August 27, 2013 summary judgment Order. Travelers believes that it has established sufficient grounds for reconsideration, and this reply and the exhibits attached hereto are offered to rebut the substantive points raised by Thunder Basin in its response.

**A.    Thunder Basin did not produce competent evidence proving that Thunder Basin was "the Buyer" referenced in the T&C.**

Thunder Basin cites *United Fire & Casualty Co. v. Thompson*, a recent Eastern District decision discussing Local Rule 7–4.01(E), in support of its argument that Travelers should have produced evidence showing a factual dispute as to the identity of the T&C's "Buyer." In selectively quoting from that decision, however, Thunder Basin fails to recognize its own failure to adequately show whether its own proposed "fact" is supported by the record. The following passage is the complete quotation from the case cited by Thunder Basin:

> Under this Court's local rules, "[a] memorandum in support for summary judgment shall have attached a statement of uncontroverted material facts,

> set forth in a separately numbered paragraph for each fact, <u>indicating whether each fact is established by the record, and, if so, the appropriate citations</u>." E.D. Mo. L.R. 7–4.01(E).  <u>In turn</u>, "[t]he opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts.  All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." (*Id.*).

1:09-CV-51 JAR, 2013 WL 1789267, at *3 (E.D. Mo. Apr. 26, 2013) (emphasis added).  Thus, a party asserting that a particular "fact" is uncontroverted must first direct the court to the part(s) of the record establishing that "fact."  Only then must the opposing party respond by directing the court to the part(s) of the record creating a genuine issue as to that "fact."  Thunder Basin's narrow reading of the cited case reverses the parties' burden and suggests that so long as a party lists a "fact" in a 7–4.01(E) Statement of Facts—even without proof—the other party must disprove it.

Although the basic inquiry in summary judgment is whether the non-moving party has *met proof with proof*, neither Rule 56 nor Local Rule 7–4.01(E) requires a non-moving party to *meet unsupported conjecture with proof*.  As Travelers explained in its motion for reconsideration, Thunder Basin did not cite to any evidence supporting its conclusion that it was "the Buyer" referenced in the T&C.  Therefore, Travelers was not required to cite record evidence in order to properly controvert this "fact."

Travelers realizes that the Court did, of course, have the benefit of the November 7, 2007 T&C along with a facsimile cover page.  However, that cover sheet paints a mixed picture.  Although Thunder Basin correctly points out that the cover sheet listed Casey Gross's title as "Senior Buyer, Thunder Basin Coal Company," other parts of the same cover page show that perhaps Arch Coal, not Thunder Basin, was "the Buyer."  [Doc. No. 89-2, at 1.]  For example, the email address of Mr. Gross is listed as "cgross@*archcoal.com*."  *Id.* (emphasis added).  Additionally, the "notes/comments" section provides:

> Hello~~~Insurance requirements for *Arch Coal*~~~We have received your updated certificate of liability insurance.  This certificate meets the requirements to perform contract labor on the ***properties of Arch Coal***.  ***Arch Coal also requires*** a signed Terms & Conditions statement to enable a vendor to perform contract labor on the mine site.  Please sign the

attached four pages.

*Id.* (emphasis added). Therefore, the record contains conflicting evidence as to whether Thunder Basin was the buyer. And, as Thunder Basin's case explaining the summary judgment process makes clear, this is enough to find that a triable issue exists:

> In passing on a motion for summary judgment, the Court must view the facts in the light most favorable to the nonmoving party, and all justifiable inferences are to be drawn in his favor. The Court's function is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions*, not those of a judge.

*United Fire & Cas. Co. v. Thompson*, 1:09-CV-51 JAR, 2013 WL 1789267, at *2 (E.D. Mo. Apr. 26, 2013) (emphasis added) (internal citations omitted).

Although a fact finder having the benefit of a fully developed evidentiary record might conclude that Thunder Basin was the T&C buyer, such evidence was not cited to this Court. Indeed, the record was susceptible to several inferences, and a reasonable fact finder could have found that Thunder Basin was not the Buyer referenced in the T&C. Therefore, summary judgment should not have been granted in favor of Thunder Basin.

    **B.    Patricia Driver's testimony does not support Thunder Basin's position that the T&C applied to the Bent 4 pad project.**

Thunder Basin contends that Patricia Driver's testimony is "immaterial to whether the [T&C] was in effect at the time of the crane collapse." [Doc. No. 129, at 6–7.] Travelers strongly disagrees because Ms. Driver's testimony creates genuine issues as to the applicability of the T&C to Travelers' insured's work on the Bent 4 pad.

In its August 27, 2013 Order, this Court found that "[t]he T&C establishes rights and obligations related to *future contracts* between Earth Works (sic) and Thunder Basin." [Doc. No. 118, at 15 (emphasis added).] Assuming that Thunder Basin is shown to be "the Buyer," the following question naturally arises: Which "future contracts" are subject to the T&C? Thunder Basin asserts that the

3

answer is "all of them." Ms. Driver's deposition testimony shows that this answer is incorrect—that the T&C provides, unsurprisingly, the terms and conditions of Thunder Basin's procurement of goods and services *by purchase order*.

The best explication of Ms. Driver's testimony is, of course, the testimony itself, and Travelers has provided this Court with her entire deposition transcript. Nevertheless, to assist the Court in determining whether this new evidence (which did not exist until several weeks after this Court ruled on the summary judgment motions) warrants reconsideration, Travelers will summarize and highlight relevant portions of the testimony.

> **1. The T&C itself is technically a "purchase order contract;" the T&C provides the terms and conditions of purchase orders.**
>
> Q. You have seen a large number of purchase orders that TBCC has, in fact, issued to vendors, correct?
>
> A. Yes.
>
> Q. All right. Those purchase orders that you have seen, are they in a particular form?
>
> A. Yes. It depends. If it's a purchase order contract terms and conditions like this, they're in one set of files kept by purchasing like this. If it's a purchase order number, it's going to be filed by purchase order number.

Driver Dep. 23:7–17, Sept. 19, 2013, [Doc. No. 123-1].

> Q. Well, it's—there's a document that says terms and conditions.
>
> A. Yes.
>
> Q. And it says, "'Buyer' as used herein means the company designated as the 'Bill To' company on the face of this purchase order ('PO' or 'Contract')." And so there is no purchase order attached to Exhibit 8, correct?
>
> A. This is the purchase order contract.  Exhibit 8 is the purchase order contract and that's what is signed.
>
> Q. And Exhibit 8 is a complete copy of what you say is the purchase order contract.
>
> A. Yes. Yes, it's our terms and conditions.

Driver Dep. 32:12–23, Sept. 19, 2013, [Doc. No. 123-1].

4

2. **Purchase orders are actual documents that exist and they are filed by purchase order number.**

> Q. Okay. What I'm talking about now is not the terms and conditions that are contained in that purchasing file, okay? I'm just talking about run-of-the-mill purchase orders that are kept by number, okay? Those purchase orders are actual documents.
>
> A. Yes.
>
> Q. Okay. And how long are they? Is it one page or how many pages?
>
> A. It would depend.
>
> Q. Okay.
>
> A. Depends what's on the order.

Driver Dep. 23:18–24:3, Sept. 19, 2013, [Doc. No. 123-1].

> Q. Okay. And there is no purchase order that is ever attached to these terms and conditions, correct?
>
> A. No purchase order number. The terms and conditions refer to themselves as a purchase order contract. There's no purchase order number, which would be something that starts like a BT and then a four-digit number. It's going to be a combination of letters and numbers. But yes, there is no purchase order number attached to this.

Driver Dep. 37:15–23, Sept. 19, 2013, [Doc. No. 123-1].

> A. There would not be a—this is—you know, the face of this purchase order, PO, or contract, there's not going to be a the actual order, like I said, a BT4S, whatever the number might be. They wouldn't—they don't go with every—we don't send out a terms and conditions every time we make an order for something.

Driver Dep. 38:8–13, Sept. 19, 2013, [Doc. No. 123-1].

3. **Purchase orders do not contain the T&C language, but they are subject to it.**

> Q. All right. Do the form purchase orders used by TBCC have language on the back that says terms and conditions and lists, you know, all the items that are on Exhibit 8?
>
> A. No.
>
> Q. Have you ever seen a purchase order that includes the terms and conditions that is Exhibit 8?
>
> A. With the purchase order number? Like on the same document?
>
> Q. Yes.
>
> A. No.

5

Driver Dep. 24:4–14, Sept. 19, 2013, [Doc. No. 123-1].

> Q. Okay. So this purchase order computer form that is in the purchasing department, that does not have attached to it these terms and conditions.
>
> A. Correct.

Driver Dep. 27:10–13, Sept. 19, 2013, [Doc. No. 123-1].

> Q. Okay. My question is is there a document—leave out number, a document that says purchase order ever attached to terms and conditions such as Exhibit 10?
>
> A. Not that I'm aware of.

Driver Dep. 38:3–6, Sept. 19, 2013, [Doc. No. 123-1].

> Q. Right. But they're also—there is never a purchase order document attached to these terms and conditions, right?
>
> A. That's true. Because this has to be signed before we would ever create a purchase order number. Without this signed, the vendor would never get a purchase order number sent to them.

Driver Dep. 38:14–20, Sept. 19, 2013, [Doc. No. 123-1].

4. **A purchase order number is generated only after a request for the procurement of goods or services is made and after a purchasing department employee verifies that the provider is a qualified vendor.**

   > Q. Okay. Tell me how it works.
   >
   > A. Somebody does a request. They fill out a requisition. They go into their own computer, plug in what they need. They type in quantity, estimated price, description. They hit go. It goes over to the purchasing department. It prepopulates. They check—the purchasing department will check, depending upon what's being requested, who they're requesting that service or good from. Purchasing goes through to make sure they're a vendor we can use, they're a qualified contractor, whatever we're looking for, and then purchasing issues a purchase order number to that order.
   >
   > Q. Okay. So the person who wants the work to get done types in information in the computer saying here's what I want to have done and here's who I want to do it, right?
   >
   > A. Yes, yes.
   >
   > Q. Okay. And then does that get e-mailed to somebody in the purchasing department or—
   >
   > A. No. It's an automated system. Once they hit go, whoever did the request, it will go to their supervisor or somebody who has an authority for that dollar amount. They have to approve it. Once they approve it, then it

6

>  automatically goes to the purchasing department.
>
>  Q. All right. And then it goes into the purchasing department and somebody—that pops up on somebody's screen, and they go through and figure out all of these—that the vendor is a qualified vendor.
>
>  A. Yes.

Driver Dep. 25:3–26:5, Sept. 19, 2013, [Doc. No. 123-1].

>  A. But if there's not a signed terms and conditions, they wouldn't be a qualified vendor, and at that point, purchasing could not issue a purchase order number to that vendor. The only way they can issue a purchase order to a particular vendor is that vendor has to be qualified. If they're not qualified, they cannot get a purchase order.

Driver Dep. 27:15–20, Sept. 19, 2013, [Doc. No. 123-1].

>  Q. Okay. So this is all part of the internal process of TBCC that is required to issue a purchase order.
>
>  A. The purchase order number, yes.

Driver Dep. 38:23–25, Sept. 19, 2013, [Doc. No. 123-1].

   5. **Once a purchase order number is generated, the purchasing department issues a purchase order.**

>  Q. Okay. The person in the purchasing department then fills out the actual purchase order or—
>
>  A. Well—
>
>  Q. —how does that work?
>
>  A. —it sort of to an extent prepopulates based on what the request was. But they won't create that until they verify that it's a qualified vendor. They may have to—depending on what it is, the purchaser may have to contact the vendor for pricing. A lot of times, depending on what's being purchased, will have to go out for bid. So the purchasing department will go out for bid.  They'll get all of these documents back, review them, review with the requester, and then that will determine, okay, we're going to go with this one from Company XYZ, whatever it is, and then they create the purchase order based on what the person requested.

Driver Dep. 26:6–22, Sept. 19, 2013, [Doc. No. 123-1].

>  Q. Again what I mean is the purchase order that is ultimately generated by the purchasing department for a specific item.
>
>  A. Okay. That would be a purchase order number.
>
>  Q. Oh, okay.

7

>   A. Yeah.

Driver Dep. 39:7–12, Sept. 19, 2013, [Doc. No. 123-1].

> 6. **A vendor must get a purchase order number before doing work under a purchase order, unless the work was done under a separate contract, such as a construction agreement or general services agreement.**
>
>   Q. All right. So this terms and conditions document, Exhibit 10, is part of the internal process of assigning a purchase order number and hiring a vendor to do some work on the mine site.
>
>   A. Yeah. It precedes it. They have to agree to our terms and conditions, and they have to provide all of their insurance requirements before they'll become a qualified vendor, and once they become qualified, we will set them up in our computer system. Until they're set up in our computer system, we cannot physically issue them a purchase order number. They can't get one. They can't get a purchase order number. They can't get paid. If they're not set up in the computer system, none of that will happen.

Driver Dep. 39:13–40:1, Sept. 19, 2013, [Doc. No. 123-1].

>   Q. And they have to get a purchase order number to do any work for TBCC?
>
>   A. Either that or a separate contract, a construction agreement or general services agreement.

Driver Dep. 40:15–18, Sept. 19, 2013, [Doc. No. 123-1].

> 7. **Separate contracts have their own terms and conditions, which may be similar to the T&C, and are negotiated by the parent company's legal department.**
>
>   Q. Do you know whether the general services agreement that you've described includes terms and conditions that are similar to what's in Exhibit 10?
>
>   A. They would be similar. I don't know if they'd be exact, but they'd be similar.
>
>   Q. Do you know whether the general services agreement includes provisions about insurance?
>
>   A. Yes, it would.
>
>   Q. Do you know whether the general services agreement includes provisions about indemnity?
>
>   A. Yes, it does.
>
>   Q. Does TBCC have a form general services agreement?
>
>   A. No, it's not a general form. It's a full contract. It will get negotiated out with our legal department in St. Louis.

8

> Q. And there are times that TBCC chooses to use a general services agreement, right?
>
> A. Yes.
>
> Q. And there are times TBCC chooses not to use one.
>
> A. Yes.

Driver Dep. 43:2–22, Sept. 19, 2013, [Doc. No. 123-1].

8. **Earth Work was already a qualified vendor before signing the November 7, 2007 T&C.**

> Q. Okay. And do you know whether there is a terms and conditions document signed by EWS that's dated before November 7, 2007? And you're welcome to go through Exhibit 10.
>
> A. Yes, I think there was. Well, let me put it this way: I know there has to be because they were a qualified vendor before that point. So it might not have been signed by EWS, but it was Osborne. Somewhere in there, they were a qualified vendor. So, yes, I know they were. Have I specifically seen it? I'm not sure.
>
> Q. But—
>
> A. But I'm very comfortable saying yes, there is.

Driver Dep. 30:7–18, Sept. 19, 2013, [Doc. No. 123-1].

Based on this testimony, it is clear that the T&C applies to procurement by purchase order and that a purchase order is only created when a purchase number is issued. However, there is no record evidence that a purchase order was ever created for the Bent 4 pad project, nor is there any evidence that a purchase order number was ever issued. Indeed, the record shows that the opposite is true: (1) Thunder Basin believed that Earth Work was assisting with the Bent 4 pad project as part of its separate construction agreement and consequently asked Earth Work to sign a "change order" request; (2) the purchasing department did not issue a purchase order number, which according to Ms. Driver would starts with the letters "BT" or "BTS4" and then be followed by a four-digit number; and (3) no purchase order was ever created. *See* Kenneth Miller Dep. 340:6–341:12, Jan. 26, 2012, [Doc. No. 86-18]; Change Order Request No. 7 and Bent 4 Pad Invoice, attached hereto as Exhibit A.

Thunder Basin's denial of the obvious implications of Ms. Driver's testimony rings hollow.

9

Unlike the Bent 4 pad invoice attached as Exhibit A, other invoices from Earth Work to Thunder Basin clearly bear purchase order numbers, indicating that the work performed was done pursuant to a purchase order. For example, several other invoices from early 2008 show that when Thunder Basin wanted Earth Work to perform work subject to the T&C, it knew how to do so. *See, e.g.*, Invoice Nos. 26670 and 26671 (dated Jan. 31, 2008), Invoice No. 26764 (dated Feb. 29, 2008), and Invoice No. 26789 (dated Mar. 31, 2008), attached hereto as Exhibit B. The Court will observe that each of these other invoices bear purchase order numbers, indicating that the work was done subject to the T&C. *See* Driver Dep. 37:15–23; 38:8–13 (Sept. 19, 2013), [Doc. No. 123-1].

Given these undisputed facts and the testimony of Ms. Driver, Thunder Basin's corporate representative, the provisions of the T&C did not apply to the Bent 4 pad project. Driver Dep. 26:6–22; 39:13–40:1; 40:15–18, Sept. 19, 2013. The additional insured endorsement provides that the contract requiring insurance be "in effect" prior to the alleged negligence. The T&C itself shows that it only governs procurement by purchase order, and Ms. Driver confirmed as much. The record shows that a purchase order number was never issued—and that a purchase order was never created—for Earth Work's work on the Bent 4 pad. *Compare* Invoice from Ex. A *with* Invoices from Ex. B. Therefore, the T&C was not "in effect," and the T&C cannot possibly govern that particular work. Furthermore, even if this Court were persuaded that the Change Order Request was a "purchase order," that document was not issued until after Earth Work had completed its work on the Bent 4 pad, which means that the T&C was not then "in effect" when Earth Work allegedly committed the acts or omissions that allegedly caused Thunder Basin to get sued.

Travelers understands the harshness of this outcome and why Thunder Basin has worked so hard to avoid it. If Thunder Basin had properly amended the scope of work of the construction agreement to include the Bent 4 pad project (and assuming that the construction agreement would have otherwise

10

satisfied the additional-insured endorsement) then Thunder Basin might have enjoyed $5,000,000 in additional-insured coverage, which is significantly more than the $2,000,000 required by the T&C. Similarly, if Thunder Basin had followed its own processes for procurement by purchase order (and had it established itself as "the Buyer" under the T&C) then Thunder Basin would have enjoyed at least the $2,000,000 in additional-insured coverage called for by the T&C. However, the additional-insured endorsements provide a specific recipe in order for a third-party to become entitled to liability coverage under the policies. The record discloses—at a minimum—that there is a genuine factual dispute as to whether Thunder Basin followed that recipe. Accordingly, this Court should reconsider its rulings on Thunder Basin's declaratory judgment claims.

    C.    **Thunder Basin—not Travelers—owes this Court an explanation about the previously unproduced March 6, 2008 T&C.**

Incredibly, Thunder Basin contends that Travelers belatedly produced the March 6, 2008 T&C and questions the legitimacy of bringing it to the Court's attention in its motion for reconsideration. The facts show otherwise:

- On July 20, 2010, Thunder Basin, through its parent company, Arch Coal, wrote to Earth Work requesting that it accept the *Milonis* claim for defense and indemnification based upon the Construction Agreement. No mention of a T&C was made. [Doc. No. 124-5, at 7–8.]

- On July 22, 2011, Thunder Basin, through Wyoming counsel, wrote to Earth Work's defense counsel in Wyoming renewing the earlier request for defense and indemnification of *Milonis* under the Construction Agreement. No mention of a T&C was made. [Doc. No. 124-5, at 9–11.]

- On November 8, 2011, Thunder Basin, through Wyoming counsel, wrote to Earth Work's defense counsel in Wyoming and, <u>for the first time</u>, asserted a right to defense and indemnification of *Milonis* under the November 7, 2007 T&C. No mention of the March 6, 2008 T&C, however, was made. [Doc. No. 95-1.] On the same day, Thunder Basin's Wyoming counsel transmitted the November 7, 2007 T&C by electronic mail to Earth Work's defense counsel in Wyoming. *See* Exhibit C.

- On June 12, 2012, Arch Coal, through Thunder Basin's counsel in this action, tendered the defense of *Salinas II* to Travelers pursuant to the additional-insured endorsements in the policies at issue. The letter, however, did not identify which document rendered Thunder Basin an additional insured. *See* Exhibit D.

- On June 21, 2012, Thunder Basin, through Wyoming counsel, wrote to Earth Work's defense counsel in Wyoming requesting that Earth Work accept the *Salinas II* claim for defense and indemnification based upon both the Construction Agreement and the November 7, 2007 T&C.  No mention of the March 6, 2008 T&C, however, was made.  [Doc. No. 124-6.]

- On July 20, 2012, Thunder Basin served its Rule 26(a)(1) initial disclosures, and identified the Construction Agreement—but not either of the T&Cs—as a document supporting its claims.  *See* Exhibit E.

- On January 17, 2013, Thunder Basin produced supplemental disclosures.  In this production, bates labeled TBCC 0038–0046, Thunder Basin produced the November 7, 2008 T&C.  Thunder Basin did not produce the March 6, 2008 T&C.  Interestingly, Thunder Basin also produced the Change Order Request No.7 <u>and the invoice that lacks a purchase order number</u>.  *See* Exhibit F.

- On August 27, 2013, this Court entered its summary judgment Order based, in great part, on the November 7, 2007 T&C.  [Doc. No. 118.]

- On September 19, 2013, during the deposition of Thunder Basin's corporate representative, Patricia Driver, Thunder Basin produced the March 6, 2008 T&C to Earth Work's defense counsel in Wyoming.  [Doc. No. 121-3.]  *See also* William C. Antes Aff. ¶ 8, Nov. 18, 2013, attached hereto as Exhibit G.

- On September 20, 2013, Earth Work's defense counsel in Wyoming transmitted the March 6, 2008 T&C to Travelers.  Prior to September 20, 2013, Travelers had not known of the existence of the March 6, 2008 T&C.  Antes Aff.¶¶ 5–9, Nov. 18, 2013, Ex. G.

- On September 23, 2013, Travelers transmitted the March 6, 2008 T&C to undersigned counsel.  Antes Aff. ¶ 10, Nov. 18, 2013, Ex. G.  This was the first time that undersigned counsel became aware that another T&C existed.

- On October 14, 2013, Travelers filed its motion for reconsideration.  [Doc. No. 123.]

- As of this date, Thunder Basin has not made a demand for defense or indemnity under the March 6, 2008 T&C.  Antes Aff. ¶ 11, Nov. 18, 2013, Ex. G.

This timeline shows that Travelers brought the March 6, 2008 T&C to this Court's attention at its earliest opportunity.  The document, of course, was in the custody of Thunder Basin for more than five-and-a-half years, and yet it was never disclosed to Travelers or this Court.  All of this suggests that Thunder Basin, not Travelers, was the dilatory party.

Moreover, it is clear that the March 6, 2008 T&C undermines Thunder Basin's position that it properly and timely tendered the defense of *Milonis* and *Salinas II* to Travelers.  The first date on which

12

Thunder Basin tendered the Wyoming cases for defense and indemnity under the November 7, 2007 T&C was on November 8, 2011.  *See* Ex. C.  Although this is certainly not timely, the fact remains that ***Thunder Basin still has not tendered either case*** under the March 6, 2008 T&C.  *See* Ex. G.  While Travelers does not believe that either T&C satisfies the additional insured endorsement under the policies, the only T&C that could have been binding when Earth Work performed its work on the Bent 4 pad was the March 6, 2008 iteration.

Furthermore, although Thunder Basin is correct that the March 6, 2008 T&C is not substantively different from the November 7, 2007 T&C, there is one important difference.  Only the November 7, 2007 T&C was sent along with an attached cover sheet providing some evidence—although insufficient to foreclose a genuine dispute—of who "the Buyer" was.  The March 8, 2006 T&C does not provide this information.  It is merely an email from CGross@archcoal.com to michelle.beck@earthwork.us.com with a subject line of "TERMSCOND3 1DOC (2).doc."  [Doc. No. 123-2.]

> **D.     Travelers' "missing term" argument is premised on the undisputable fact that the T&Cs themselves do not identify "the Buyer."**

Unsurprisingly, Thunder Basin agrees that this Court properly considered the fax cover sheet in trying to identify "the Buyer" referenced in the T&C.  Travelers understands that the Court is unlikely to reconsider its parole evidence ruling.  However, in light of the fact that the March 6, 2008 T&C is now in the record—which does not have an attached cover sheet similar to the one purportedly sent with the November 7, 2007 document—Travelers asks this Court to reconsider whether the objective elements of contract formation are met.  There is simply no record evidence proving that Thunder Basin was indisputably "the Buyer."  As set forth above, the now-superseded cover sheet does not foreclose a genuine dispute as to the identity of "the Buyer."

> **E.     Collateral estoppel should preclude Thunder Basin from alleging that the T&C applied to the Bent 4 pad.**

Thunder Basin wrongly accuses Travelers of belatedly grasping at straws by arguing that the

13

T&C could possibly impose special tort duties on Earth Work toward third parties.  First, this is not a new argument, as Travelers made it in opposition to Thunder Basin's motion for summary judgment.  [Doc. No. 110, at 6, 9 n. 1 & n. 2.]  Second, without rehashing the arguments made in Travelers' opening brief, the issue adjudicated in *Milonis* (and earlier in *Salinas I*) was whether a particular contract governed Earth Work's work on the Bent 4 pad project.  Although the parties were arguing for and against the applicability of only the Construction Agreement, ***that was because Thunder Basin had not yet advanced either T&C***.  Certainly, however, Thunder Basin ***could have argued***—as it has done in this action—that even if the Construction Agreement did not apply to the Bent 4 pad project, the T&C did.  This was a full and fair opportunity to argue an adjudicated issue, and Thunder Basin should be estopped to assert a different position in this action.

## CONCLUSION

Travelers has great respect for this Court and requests reconsideration fully aware of the stringent legal standard typically applied to such motions.  However, the recent developments of the newly discovered March 6, 2008 T&C and Driver deposition have changed the landscape to an extent the present motion should be well-taken and fully considered.  Specifically, if the Driver deposition and the March 6, 2008 T&C were in the summary judgment record before August 27, 2013, Travelers believes that its motion, and not Thunder Basin's, would have been granted.  At the very least, however, there are now several genuine issues of fact that are material to Thunder Basin's claims for declaratory judgment.  Accordingly, Travelers respectfully requests that this Court grant its motion for reconsideration.

        ARMSTRONG TEASDALE LLP

BY:   /s/ *Jonathan R. Shulan*
      Jonathan R. Shulan, #65426MO
      7700 Forsyth Blvd., Suite 1800
      Saint Louis, Missouri 63105
      314.621.5070
      314.612.2322 (facsimile)
      jshulan@armstrongteasdale.com

      Laurence R. Tucker, *Pro Hac Vice*
      2345 Grand Boulevard, Suite 2000
      Kansas City, Missouri 64108-2617
      816.221.3420
      816.221.0786 (facsimile)
      lrtucker@armstrongteasdale.com

*ATTORNEY FOR THE TRAVELERS INDEMNITY COMPANY OF AMERICA AND THE TRAVELERS PROPERTY AND CASUALTY COMPANY OF AMERICA*

## CERTIFICATE OF SERVICE

I hereby certify that on the 18th day of November 2013, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system.

      /s/ *Jonathan R. Shulan*